## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Sundeep-Kishore<br>  Plaintiff pro se | )<br>)<br>) |
| vs. | )    Civil No. 07-1299(RMC)<br>) |
| U. S. Department of Justice, et al<br>  Defendants | )<br>) |

### Plaintiff's Response to Defendants' Motion to Dismiss

1. Defendants' theory of Plaintiff's Claims of Delay in release of Responsive Documents is not IRRELEVANT.

Plaintiff's rights were discriminated against, and Plaintiff could not get a fair trial in CF-2003-1331 in Oklahoma County, Oklahoma, and in CF-2003-123 in Lincoln County, Oklahoma, due to defendants' blatant disregard to afford the Plaintiff a "fair trial."


2. Defendants' Theory that the Plaintiff's Response to the Boseker Declaration is Based on Mere Speculation

   A. The spelling of the Plaintiff's Name.

   The originator of the documents are the federal authorities, the FBI and the U. S. Attorneys' Office, not the Oklahoma authorities.

   B. Plaintiff's speculation about the Existence of Documents.

   Plaintiff provides a copy of the Preliminary transcript in CF-2003-123, in the District Court of Lincoln County, Oklahoma, where FBI Special Agent Gillespie was cross-examined by Plaintiff Kishore.

**RECEIVED**

MAY 1 5 2008

1

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Page 18. No documentation provided by the FBI or USA about exact reports on the execution of the search warrant.

Page 19 shows that the FBI and USA have not provided the surveillance reports.

Page 20. No reports provided by the FBI, from the supervisor, squad leader task force Special Agent Scott Chaffin.

Page 22. No documentation provided by the FBI about FBI Special Agent Wagner's being charge with a felony crime of False Reporting of Crimes, in 2005 in Cleveland County, Oklahoma.

Page 26. No documentation provided by the FBI about the investigation on the life insurance policy or the Plaintiff's change of beneficiary to himself. This was the critical element of obtaining the search warrant.

Page 29. Surveillance reports no provided.

Page 31.No reports from Sgt. Bradford provided. Oklahoma City police have stated they have "no records." Sole keeper of records is the FBI.

Page 32. No reports of logs maintained for monitoring conversations by the FBI, or the sealing done by the U. S. Attorneys' Office.

Page 32. No information provided on FBI-CI entering the residence/office - before search warrant was executed. This is vital as it points to the FBI Agents' exertion over the criminal enterprise with their CI. Public Citizens Litigation Group, **Lucena v. United States, 180 F.3d 321 (D. C. Cir. 1999)**.

3. Plaintiff's Response to the Hardy Declaration.

As mentioned in 2, applies to the FBI also. ⁎

Plaintiff signed a disbursement from for the payment to be made by the facility, but due to the facility sending the partial filing cost fees to the District of Columbia, the funds were insufficient. Plaintiff requested the Embassy of Austria to send the payment to the FBI. The Embassy of Austria called the FBI to get this taken care of, but the FBI would not return the call. Letter from Consul General Gernot Wiedner, Embassy of Austria attests to this. Letter enclosed.

As these facts show, Plaintiff's allegation that the Defendants have improperly withheld documents has validity.

Defendants are not entitled to judgement as a matter.

PLAINTIFF submits into evidence, partial copy of the TRANSCRIPT in PRELIMINARY HEARING in CF-2003-123, in LINCOLN County, OK. Also copy of letter to RENEE CLINE ACCOUNTS SUPERINTENDENT request payment be made to the FBI. Copy of letter from PENN MUTUAL, and copy of letter from AUSTRIAN Consulate

Respectfully submitted, Kishore Sundeep-KISHORE

⁎ These reports had to be filed as per internal policies and guidelines of the Department of Justice.

Plaintiff Kishore states that all information given by him is true to the best of my knowledge.

*Kishore*

# Certificate Of Service

I hereby certify that on this 8th day of May 2008, I sent a copy of the Plaintiffs Response To Defendants Motion To Dismiss to be mailed postage pre-paid to Assistant United States Attorney Mercedeh- Momeni at 555 4th Street, N.W., Civil- Division, Washington D.C. 20530.

*Kishore*

IN THE DISTRICT COURT OF LINCOLN COUNTY
STATE OF OKLAHOMA

THE STATE OF OKLAHOMA,           )
                                 )
          Plaintiff,             )
                                 )
V.                               )   Case No.  CF-2003-123
                                 )
SUNDEEP KISHORE,                 )
                                 )
          Defendant.             )

COPY

## TRANSCRIPT OF PRELIMINARY HEARING

Held on:    TUESDAY, AUGUST 22, 2006

Before:     THE HONORABLE CRAIG S. KEY
            Associate District Judge


<u>APPEARANCES</u>:


    CLAYTON NIEMEYER, Assistant District Attorney, Lincoln
County Courthouse, 811 Manvel Avenue, Suite 1, Chandler,
Oklahoma 74834, appearing on behalf of the State of
Oklahoma.


    SUNDEEP KISHORE, Defendant, appearing pro se.

    BARNEY BARNETT, Attorney at Law, 110 W. 8th, Chandler,
Oklahoma  74834, appearing as legal advisor for the
defendant.



Reported by:    Melissa D. Upton, CSR
                District Court Reporter
                Lincoln County Courthouse
                811 Manvel Avenue, Suite 10
                Chandler, Oklahoma  74834


─── DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT ───

1        THE COURT:  Yes, it is.

2        MR. BARNETT:  Okay.

3        THE COURT:  And I'll make sure the record so

4   reflects.

5        MR. BARNETT:  Thank you, Judge.

6        THE COURT:  Call your first witness.

7        MR. NIEMEYER:  Robert Gillespie.

8     (The witness was sworn.)

9        THE COURT:  Please be seated.

10        MR. BARNETT:  Judge, would it be possible to

11   get his cuffs off while we're --

12        THE COURT:  Yeah.  We'll need to uncuff him

13   so he can. . .

14      Go ahead, state.

15                    ROBERT GILLESPIE,

16   called as a witness on behalf of the State of Oklahoma,

17   after having been first duly sworn, testified as follows:

18                    DIRECT EXAMINATION

19   BY MR. NIEMEYER:

20   Q     Tell us your name, sir.

21   A     Robert E. Gillespie.

22   Q     What's your occupation?

23   A     I'm a special agent with the FBI in Oklahoma City.

24   Q     How long have you been with law enforcement with

25   the FBI?

─────── DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT ───────

1    <u>CROSS-EXAMINATION</u>

2    <u>BY MR. KISHORE</u>:

3    Q    What time did you execute the search warrant?

4    A    I would believe it's approximately between 9:00 and

5    10:00 p.m., I believe.  It was dark.

6    Q    9:00 and 10:00 p.m.?

7    A    I believe it was.

8    Q    Are you sure about the fact?

9    A    No, not exactly.

10   Q    You're not sure about the fact?

11   A    It was later in the evening.

12   Q    Could it be 6:00 in the evening?

13   A    It could have been that early.  It was dark.

14   Q    So it could have been 6:00 in the evening and it

15   could have been 9:00 in the evening also?

16   A    It could have.  It was three years ago.

17   Q    Three years ago?

18   A    Three years ago.

19   Q    And you were a federal investigator task force;

20   right?

21   A    I was on a drug task force, yes, sir.

22   Q    Yes.  Did you file any report by the FBI?

23   A    Excuse me?

24   Q    Did you file any reports by the FBI, Oklahoma City?

25   A    Of what I did?  Yes, sir.

1  Q    You did?

2  A    Yes, sir.

3  Q    You're sure of that?

4  A    Yes, sir.

5  Q    So if I have documentation to show from the FBI

6  that they have no reports concerning me, not of any

7  investigation concerning me, then that would be not true?

8  A    That's correct.

9  Q    Okay.  You had me under surveillance for how many

10  days?

11  A    It was either one or two, I believe.

12  Q    One or two?

13  A    One or two.

14  Q    Are you sure about that fact also?  It may have

15  been four also?

16  A    It could have been three or four, but I don't think

17  more than that.

18  Q    It could have been three or four.  So it could have

19  been one, two, three, or four; right?

20  A    It could have been.

21  Q    There are no reports -- you filed no federal FD302

22  reports?

23  A    I wasn't responsible for those other than the one

24  I --

25  Q    Who was the -- -

1    THE COURT:  Hold on just a moment.  Let him
2  finish answering his question before you interrupt;
3  otherwise, we will have a very unclear record.
4    MR. KISHORE:  Okay, sir.
5    THE COURT:  All right.  We need to make sure
6  my court reporter has the ability to get all this down.
7    MR. KISHORE:  Okay, sir.
8  Q    (By Mr. Kishore)  All right, sir.  Who was the
9  squad leader of this task force?
10  A    I believe at that time supervisor Special Agent
11  Scott Chaffin.
12  Q    Scott Chaffin.  Was he there at the incident?
13  A    Yes, he was.
14  Q    Was that -- you had the defendant under
15  surveillance the whole day; right?
16  A    Which day?
17  Q    On March 1, 2003.
18  A    I don't recall what time we started it.  It had to
19  have been sometime in the afternoon, probably 1:00 or
20  2:00, we started.  And I don't know whether we had you
21  under surveillance or whether we had the residence under
22  surveillance.  Part of that time I was not there in
23  Prague.
24  Q    Where was your FBI informant at that time?
25  A    No idea.

```
1    Q      No idea?

2    A      No idea.

3    Q      Do you have any report of the FBI informant

4    entering the same place where the search warrant was

5    served several hours before when the defendant was not

6    there?

7    A      No, I don't.

8    Q      You don't have no recall of that?

9    A      No recall of that.  Part of the time I was here in

10   Chandler getting the warrant, so I wasn't available for

11   the entire surveillance.

12   Q      So there's no record of the FBI informant ever

13   entering the residence on that day?

14   A      Cannot say to that.

15   Q      Would somebody from the FBI be able to say that?

16   A      I don't know.

17   Q      Who was the person who interrogated the defendant?

18   A      I believe one of them was Special Agent Chris

19   Wagoner.

20   Q      Chris Wagoner?

21   A      And I don't recall if there was -- I know there was

22   another one, but I'm not sure whether it was Special

23   Agent Robert Swarens or someone else.  I wasn't there.  I

24   was doing the search.

25   Q      Are they still with the FBI?
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

```
1   A      Yes, they are.

2   Q      Has FBI Agent Wagoner ever been charged with a

3   crime?

4   A      I believe he has.

5   Q      He has been charged with a crime?

6   A      I believe he has.

7   Q      What exactly was the nature of the crime?

8   A      I do not know.

9   Q      Was it false reporting of crimes?

10  A      I don't know.

11  Q      You don't have no idea about that?

12  A      No.

13  Q      The FBI office can provide us records about that?

14  A      You would have to talk to them.

15  Q      So once again, we have no record of the FBI

16  informant ever entering the residence on that day --

17  A      Not to the best of my knowledge.

18  Q      -- when the defendant was not there?

19  A      Not to the best of my knowledge.  I wasn't there.

20  I was not there during -- the whole time.

21  Q      Do you have any records on that?

22  A      Again, you would have to talk to the office.

23  Q      I would have to talk to the office?

24  A      Yeah.

25  Q      But normally that should have been provided to the
```

1  district attorney's office?

2          THE COURT:  That's argumentative, sir.

3          MR. KISHORE:  I'm sorry, sir.

4  Q    (By Mr. Kishore)  Was your FBI informant known to

5  be a drug dealer?

6  A    I believe at one time he did get arrested for such

7  a thing.

8  Q    He did?

9  A    I believe he was.

10  Q    Could it be that when he entered the residence,

11  that he put the drugs in there?

12  A    That's a speculation.  I can't do that.

13  Q    Did you-all make him sign any statements?  Normally

14  when the FBI works with an informant, they make him sign

15  a statement.

16  A    It wasn't my informant.  I don't know what was done

17  with the man.

18  Q    Whose informant was he?

19  A    I believe it was Special Agent Robert Swarens.

20  Q    Can we get any of his notes?

21  A    That, you would have to discuss with him.

22  Q    But he's not here, so I can't.

23          THE COURT:  That would be argumentative as

24  well.

25          MR. KISHORE:  I'm sorry, sir.

1   Q      (By Mr. Kishore)  So once again, if I show you

2   something from the FBI office which says that they have

3   no records of any investigation against me, you wouldn't

4   know anything about that?

5   A      No, I wouldn't have prepared it.  I wouldn't know.

6   Q      Do you have any FD302 forms?

7   A      With me?

8   Q      Yeah.

9   A      I have several, but none that pertain to you.

10  Q      None pertaining to me?

11  A      No, sir.

12  Q      So you-all did not file any report on that day?

13  A      Yes.

14  Q      Where?

15  A      I'm sure they're in your file.

16  Q      Did you file it with the FBI --

17  A      Yes, I did.

18  Q      -- your regular forms?

19  A      Yes, sir.

20  Q      You did?

21  A      Yes, sir.

22  Q      Can I look at one of them?

23  A      That, you would have to talk to the district

24  attorney and he would get a hold of the FBI office.  I

25  don't have them with me.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   Q     And you're sure that the defendant stayed at that

2   residence?

3   A     We were led to believe that, yes.

4   Q     You were led to believe that. But you had the

5   defendant under surveillance three or four days?

6   A     Correct.

7   Q     Did you see him staying there?

8   A     We never followed him out to Prague except for the

9   last day when we saw you go into the office or go into

10  the residence.

11  Q     When you arrested the defendant, where was he

12  standing?

13  A     Beside his car.

14  Q     He was outside the premises; right?

15  A     I believe so, yes.

16  Q     Had he just come back from somewhere?

17  A     You had just come out of the residence door.

18  Q     How long was it before the defendant had come back

19  to Prague?

20  A     Not very long, a few minutes.

21  Q     A few minutes; right?

22  A     A few minutes.

23          MR. KISHORE:  That's about all.

24          THE COURT:  Is that all the questions you

25  have for this witness?

1          MR. BARNETT:  Could I visit with him just for

2    a moment, Judge, before he lets him go?

3          (There was a pause in the proceedings.)

4    Q    (By Mr. Kishore)  When you applied for the search

5    warrant, did you give information to the judge that I had

6    a life insurance policy on a certain individual who

7    supposedly I was going to kill and get the money from the

8    life insurance?  Is that true?

9    A    That's true.  That's what we were told, and that's

10   why we got the warrant.

11   Q    Yeah.  But you had an investigation; right?  Did

12   you check into the facts?

13   A    Me personally?  No.

14   Q    Nobody checked into the facts?

15   A    I'm not saying that.  I said, I didn't.

16   Q    You didn't.  Do you know of any other officer who

17   checked on the facts?

18   A    No, I don't.

19   Q    So you never checked the basic fact for which you

20   went and got the search warrant for; is that right?

21   A    That wasn't the basic fact.  The life insurance

22   policy wasn't the basic fact.  It's part of it.

23   Q    Let me look at the search warrant again.

24   A    It's part of it, but it's not -- it wasn't the

25   whole major reason why we got the search warrant.

1    Q     It wasn't?

2    A     No.  It was only a part of the puzzle.

3    Q     A part of the puzzle.  What led you to believe that

4    the defendant was staying at that address?

5    A     Part of it was, I believe, informant information

6    and part of it was when we went to the Prague Police.

7    Q     And the Prague Police Department told you that the

8    defendant stays there?

9    A     No.  They just told us what the address was.

10   Q     Oh.  You didn't ask them if the defendant stays

11   there?

12   A     No.

13   Q     Were there any other people in that place?

14   A     Sherry Kishore lived there, and there were several

15   other people that were, I guess, residents of the

16   establishment.

17   Q     Were there any other persons working there?

18   A     I don't know if other people were working there or

19   not.

20   Q     You don't know none of the facts.  So the drugs

21   could be anybody's?

22   A     I guess that's possible, yeah.

23   Q     It is possible; right?  Did the defendant ever tell

24   you that the drugs were his?

25   A     Tell me?  No.

─── DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT ───

1   Q      You never spoke to the defendant, did you?

2   A      No.

3          MR. KISHORE:  That's about it.

4          THE COURT:  That's all the questions that you

5   have?

6          MR. KISHORE:  For right now.

7          THE COURT:  Well, this is your only chance,

8   so you're not going to get another chance.

9   Q      (By Mr. Kishore)  Did you find any evidence out

10  there that said -- that would show that the defendant, if

11  at all, is linked to the drugs, that he was going to

12  distribute it?

13  A      You mean, other than the fact that it was in three

14  baggies?

15  Q      Right.

16  A      No.  We didn't find any scales or anything of that

17  nature.

18  Q      Have you provided a log to show when your FBI

19  informant entered that place on that same day?

20  A      I don't know if one was made.  Like I said, I -- I

21  don't know if he was in there or not.

22  Q      Who was the FBI informant with on that day?

23  A      I don't know.

24  Q      You don't know?

25  A      I wasn't surveilling the FBI informant.

1   Q      So nobody from the FBI would know where the FBI

2   informant was?

3   A      I don't, no.  Whether somebody in the office, they

4   might.

5   Q      Do you have records of that?  Would you --

6   A      Me?  No.

7   Q      Somebody would?

8   A      Possibly, yes.

9   Q      Possibly, yes.  And you didn't find any weights or

10  any measures or anything to measure drugs or anything

11  like that?

12  A      No.  But we really wasn't looking for that.

13  Q      You weren't looking for that?

14  A      No.

15  Q      And you had the defendant under surveillance for

16  four days; right?

17  A      That's sounds about right.

18  Q      That sounds about right?

19  A      Somewhere between two and four days.

20  Q      Two and four days.  Did you ever see the defendant

21  use any drugs during the four days?

22  A      No.

23  Q      You never saw the defendant use any drugs during

24  the four days?

25  A      No.

—————— DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT ——————

1    Q    So you have no personal knowledge of it?

2    A    Of you using drugs?

3    Q    Yes.

4    A    Personal knowledge, no.  I never seen you.

5    Q    Did you ever during the surveillance observe the

6    defendant at that residence?

7    A    We never followed you out to Prague, no.

8    Q    The officer who got the search warrant, was he an

9    FBI officer?

10   A    No, sir.  He's Oklahoma City Police Department.

11   Q    And he doesn't work with the FBI?

12   A    No.  He was reassigned.

13   Q    He was reassigned?

14   A    Yes.

15   Q    But at that time, was he working --

16   A    At that time, he was working with the FBI.

17   Q    So he was actually a federal agent?

18   A    No, he was not.

19   Q    He wasn't?

20   A    No.  He's a task force officer.

21   Q    But he was an employee of the FBI?

22   A    No, he was not.  He was still an employee of the

23   Oklahoma City Police Department.

24   Q    So he's -- maybe he filed some paperwork with the

25   Oklahoma City Police Department?

1    A    I would imagine he filed with Lincoln County.

2    That's where the search warrant would be returned.

3    Q    The search warrant would be returned. But I'm

4    saying his reports.  The initial investigative reports

5    and all, where would he have filed those?

6    A    I would assume with his department or with the FBI.

7    Q    If I show you something from the Oklahoma City

8    Police Department which says they have no records from

9    Sergeant Bradford at all --

10   A    I couldn't dispute it.

11   Q    You couldn't dispute that?

12   A    No.

13   Q    So you won't dispute the fact that the FBI says

14   they have no records, the Oklahoma City Police have no

15   records of that date?

16   A    I can't dispute that.  It's not my responsibility

17   to make sure other people do their paperwork.

18   Q    But you filed a report, you said; right?

19   A    Yes, I did.

20   Q    Okay.  When you had the defendant under

21   surveillance, what techniques were you using?

22   A    I'm sorry?

23   Q    What techniques were you using for your

24   surveillance?

25   A    We just followed you.

—DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT—

```
 1   Q      "Just followed you"?

 2   A      Yes.

 3   Q      And you were wiretapping also?

 4   A      No.  Wiretapping is a technique --

 5   Q      You were monitoring conversations?

 6   A      Yes, sir.

 7   Q      Did you fill out the federal forms for that?

 8   A      No, I did not.

 9   Q      Why not?

10   A      It's not my job.  It wasn't my informant.

11   Q      It wasn't your informant.  But normally when a
```

defendant wears a bug or something to record a

conversation, you have to sign some forms for it.

```
14   A      The informant does, yes --

15   Q      The informant does?

16   A      -- and whoever handles the informant fills out that
```

paperwork, not me.

```
18   Q      Will you make sure that all your FBI reports and
```

all kind of reports that you have on this case are turned

over to the state -- to the DA?

```
21   A      Did I?

22   Q      No.  Will you now make sure that you do hand over
```

all the reports?

```
24   A      Yes.  If he requests them, I will get him copies of
```

what I wrote.

---

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    Q    You never spoke to the defendant at all, did you?

2    A    No, I don't believe I did.

3    Q    Not for a single minute?

4    A    No.

5    Q    So you have no personal knowledge of anything of

6    that day?

7    A    Personal knowledge of that day?

8    Q    What happened inside.

9    A    Other than the search warrant, no.

10          MR. KISHORE:  That's all, your Honor.

11          THE COURT:  You may have a seat.

12    Anything further, state?

13          MR. NIEMEYER:  No, sir.

14          THE COURT:  You may step down, sir.

15          MR. NIEMEYER:  The state rests.

16          THE COURT:  The state rests.

17          MR. BARNETT:  Judge, I --

18          THE COURT:  He's representing himself.

19          MR. BARNETT:  Okay.

20          THE COURT:  If at this point he wants you to

21    step in, you're in for the duration.  He will not

22    represent himself.  He needs to realize that he can't

23    have the best of both worlds.  He's chosen to represent

24    himself.  This Court has made a finding that he has that

25    ability, so at this time he represents himself.

1          MR. KISHORE:  Your Honor, I already filed a

2    motion for a *Franks* hearing.  The facts of the affidavit

3    are false and they're knowingly false.

4          THE COURT:  At this time -- I'm trying to

5    figure out exactly -- are you objecting to the search

6    warrant?

7          MR. KISHORE:  I'm objecting to the search

8    warrant.

9          THE COURT:  Are you asking that it be

10   suppressed?  Is that what you're doing?

11         MR. KISHORE:  Excuse me, sir?

12         THE COURT:  Do you want to be heard, Clayton?

13         MR. NIEMEYER:  Judge, do you want me to get

14   into the *Franks* issue?  Is that where we're going with

15   this?

16         THE COURT:  I don't know where he's going

17   with this.

18       Go ahead and make any arguments you have at this

19   time, sir.

20         MR. KISHORE:  Well, the motion for the *Franks*

21   hearing, sir, first of all, the search warrant really

22   don't say anything that says I stayed at that address or

23   that I have control.  There's been no agreement,

24   financing agreement, for murder and insurance fraud.

25       The search warrant, really, is for a business.

**ÖSTERREICHISCHE BOTSCHAFT**
**WASHINGTON**                                    WASHINGTON, am 17. März 2008

Zl. 6.30/10/08                    ÖSTERREICHISCHE BOTSCHAFT
                                 AUSTRIAN EMBASSY
                                 3524 International Court, N.W.
                                 Washington, D.C. 20008-3027

Sehr geehrter Herr Kishore,

Bitte entschuldigen Sie die etwas verspätete Antwort, auf die insgesamt 3 Briefe, die ich in den letzten Wochen erhalten habe.
Ich darf mich gleichzeitig für Ihre Bemühungen bedanken, mich auf dem Laufenden zu halten.
Nun zu Ihren Fragen im Speziellen:

- In den Akten der Botschaft findet sich keine Korrespondenz zwischen der Botschaft (Fr. Richardson-McKinnen mit dem ADA Ken Stoner vom/vor Mai 2005.
- Ein Scheck an das FBI betreffend die Zurverfügungstellung von Dokumenten konnte mangels Zuständigkeit beim FBI nicht abgeschickt werden. Ein diesbezüglicher Anruf blieb ergebnislos.
- Ich habe bei Christine Cave (neues Office, neue Telefonnummer) Nachrichten hinterlassen, woraufhin sie mich heute zurückgerufen hat. Sie hat in einem an Sie gerichteten Schreiben zu den von Ihnen aufgeworfenen Fragen Bezug genommen, welches Sie in den nächsten Tagen erhalten sollten (Kopie über mein Ersuchen auch an mich).
- Betreffend Telefonliste liegt das Problem darin, dass man keine Nummern erlauben will, die mit einer Bandinformation versehen sind, da in diesem Fall kein collect call gemacht werden kann (cell phones detto). Sie könnten (noch einmal) versuchen, meine Direktnummer anzugeben, da ich – wenn ich anwesend bin und abhebe – einem collect call zustimmen kann. Es ist dies 202 895 6709.
- Ich schicke Ihnen mit gleicher Post, jedoch an die dafür vorgesehene, spezielle Adresse eine weitere, finanzielle Unterstützung aus unserem (kleinen) Unterstützungs-Topf. Ich hoffe, dass Sie damit Ihre Ausgaben im Zusammenhang mit Ihrer Rechtskorrespondenz einigermaßen abdecken können.

Bitte halten Sie mich weiterhin am Laufenden. Selbstverständlich wird Ihnen auch die Botschaft so gut es geht zur Seite stehen.

Mit freundlichen Grüssen

Gernot Wiedner
(Generalkonsul)

05 10 03676



## Penn Mutual

*A better way of life*

Oklahoma Insurance Department
**RECEIVED**
NOV 1 4 2005
**Consumer Assistance Division**

November 8, 2005

Mr. Brad Bryant, Director
Consumer Assistance/Claims Division
Oklahoma Insurance Department
State of Oklahoma
P O Box 53408
Oklahoma City, OK  73152-3408

RE: Sundeep Kishore, inquirer

Dear Mr. Bryant:

I am responding to your letter dated October 27, 2005 regarding the above mentioned individual.

We have reviewed our files and determined that we have no information that the Penn Mutual Life Insurance Company insured "Mr. Jeff Michael Watson", the individual referenced in Mr. Kishore letter.  In addition, we have no information on Mr. Kishore's alleged attempts to effectuate a change of beneficiary.   We would be happy to review our records further upon receipt of some additional identifying information regarding coverage with our company, i.e. copy of a policy and/ or a premium notice showing the individual name and/ or policy number.

I hope this information is helpful. If I can render any further assistance, please feel free to contact me at 1-866-625-8504.

Sincerely,

*Lisa C. Gottlieb*

Lisa C. Gottlieb
Market Conduct and Compliance Specialist

Renee Cline
Account Superintendant  D.O.C. Oklahoma
Inmate Trust Fund Supervisor
[over Mandatory Savings]
Post Office Box 400
Oklahoma- City
OK- 73136

5-14-08

RE: Sundeep- Kishore  DOC- 517067

Dear Ms. Cline,

I had written to you early January 2008, requesting that an amount of $21 . Twenty-One dollars be remitted from my mandatory savings to the FBI. I have a FOIPA case against the U.S. Department of Justice, the FBI and the U.S. Attorneys office.

I have not got any response from you and am requesting you again to please remit the FBI the sum of twenty - one dollars, for a FOIPA Civil Action No. 07-1299(RMC) in the United States District Court, for the District of Columbia, Washington D.C. Please give the FOIPA No. : 1067407-001

I am enclosing you a copy of the letter from Mr. David. M. Hardy, Section Chief Records, FBI- Washington D.C.

I am an AUSTRIAN citizen, and do not have any relatives or friends in the U.S., and have no other way of making this payment.

Please mail the check to FBI - PENNSYLVANIA AVENUE, WASHINGTON D.C. 20535.

THANKING You
Sincerely
Kishore
SUNDEEP - KISHORE
# 517067  LCF - GEO
8607 S.E. FLOWER MOUND RD, LAWTON OK-73501-9765

ENCLOSURE:
FBI letter from DAVID M. HARDY, Section Chief - FBI.

Copy:
1) MR. GERNOT WIEDNER
COWSUL GENERAL - EMBASSY of AUSTRIA

2) UNITED STATES DISTRICT JUDGE COLLMEYER
DISTRICT of COLUMBIA
WASHINGTON D.C.        CIV - 07-1299 (RMC)